_____

LYNN KUNKEL,

                              Plaintiff                                      DECISION AND ORDER

-vs-                                                                              12-CV-6478 CJS

COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
_____

## APPEARANCES

For the Plaintiff:          Howard D. Olinsky, Esq.
                                Karen S. Southwick, Esq.
                                Olinsky & Shurtliff, LLP
                                300 South State Street
                                Syracuse, New York 13202

For the Defendant:       Kathryn L. Smith, A.U.S.A.
                                United States Attorney's Office
                                100 State Street
                                Rochester, New York 14614

## INTRODUCTION

        This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final

determination of the Commissioner of Social Security ("Commissioner" or "Defendant"),

denying the application of Lynn Kunkel ("Plaintiff") for Social Security Disability Insurance

benefits and Supplemental Security Income benefits.  Now before the Court is Plaintiff's

motion (Docket No. [#7] for judgment on the pleadings and Defendant's cross-motion

[#13] for judgment on the pleadings.  Plaintiff's motion is denied, Defendant's motion is

granted and this matter is dismissed.

1

STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive."  The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998).  Substantial evidence is defined as "more than a mere scintilla," and "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition.  First, the SSA considers whether the claimant is currently engaged in substantial gainful employment.  If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities.  If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations.  If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled.  If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work.  Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

Pertinent to the instant case, however, "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material

2

to the Commissioner's determination that the individual is disabled." 42 U.S.C. § 423(d)(2)(C).  If the ALJ finds that the claimant is disabled and that there is evidence of drug addiction or alcohol abuse, the ALJ must further "determine whether [such] drug addiction or alcoholism is a contributing factor material to the determination of disability." 20 C.F.R. § 404.1535(a).  In that regard, the Commissioner's regulations state:

> (1) The key factor we will examine in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability is whether we would still find you disabled if you stopped using drugs or alcohol.
> (2) In making this determination, we will evaluate which of your current physical and mental limitations, upon which we based our current disability determination, would remain if you stopped using drugs or alcohol and then determine whether any or all of your remaining limitations would be disabling.
>
>> (i) If we determine that your remaining limitations would not be disabling, we will find that your drug addiction or alcoholism is a contributing factor material to the determination of disability.
>> (ii) If we determine that your remaining limitations are disabling, you are disabled independent of your drug addiction or alcoholism and we will find that your drug addiction or alcoholism is not a contributing factor material to the determination of disability.

20 CFR § 404.1535(b).

Under the regulations, a treating physician's opinion is entitled to controlling weight, provided that it is well-supported in the record:

> If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.

20 C.F.R. § 416.927(c)(2); 20 C.F.R. § 404.1527(c)(2).  However, "[w]hen other

substantial evidence in the record conflicts with the treating physician's opinion . . . that opinion will not be deemed controlling. And the less consistent that opinion is with the record as a whole, the less weight it will be given." *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999)(*citing* 20 C.F.R. § 404.1527). Nevertheless,

> [a]n ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion. 20 C.F.R. § 404.1527(d)(2). Among those factors are: (i) the frequency of examination and the length, nature and extent of the treatment relationship; (ii) the evidence in support of the treating physician's opinion; (iii) the consistency of the opinion with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other factors brought to the Social Security Administration's attention that tend to support or contradict the opinion. *Id*. The regulations also specify that the Commissioner 'will always give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion.' *Id*.; *accord* 20 C.F.R. § 416.927(d)(2); *see also Schaal*, 134 F.3d at 503-504 (stating that the Commissioner must provide a claimant with "good reasons" for the lack of weight attributed to a treating physician's opinion).

*Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004).

Administrative Law Judges are required to evaluate a claimant's credibility concerning pain according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons

may provide about how the symptoms affect your activities of daily living and your ability to work.

***

In evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings and statements about how your symptoms affect you. (Section 404.1527 explains how we consider opinions of your treating source and other medical opinions on the existence and severity of your symptoms, such as pain.) We will then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work.

20 C.F.R. § 404.1529(a); 20 C.F.R. § 416.929(a).  The regulation further states, in relevant part:

Factors relevant to your symptoms, such as pain, which we will consider include:
(i) Your daily activities;
(ii) The location, duration, frequency, and intensity of your pain or other symptoms;
(iii) Precipitating and aggravating factors;
(iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
(v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;
(vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
(vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3); 20 C.F.R. § 416.929(c)(3).  However, "[f]ailure to *expressly* consider every factor set forth in the regulations is not grounds for remand where the reasons for the ALJ's determination of credibility are sufficiently specific to conclude that he considered the entire evidentiary record in arriving at his determination." *Wischoff v. Astrue*, No. 08–CV–6367 MAT, 2010 WL 1543849 at *7 (W.D.N.Y. Apr. 16, 2010) (emphasis added; citation and internal quotation marks omitted).

## PLAINTIFF'S VOCATIONAL HISTORY

Plaintiff was forty years of age at the time of the hearing before the ALJ. (Tr. 66).

Plaintiff attended high school through the eleventh grade. Plaintiff's employment history

consists of work as a waitress and as a custodian in a public library. Specifically, Plaintiff

worked at the City of Rochester's Central Library. (Tr. 66). Strangely, at the hearing

before the ALJ, Plaintiff indicated that she stopped working at the library because it was

torn down:

> Q. And why'd you leave that job?
>
> A. The building no longer stands. They laid everybody off.
>
> Q. So they tore down the library?
>
> A. Yes. I would be late a lot also.
>
> Q. I'm sorry?
>
> A. So they didn't – I would be late a lot also so they wouldn't – they
> couldn't count on me.

(Tr. 67). The Court takes judicial notice of the fact that the Rochester Central Library is

still operating and has not been torn down.

## THE MEDICAL EVIDENCE

In January 2004, Plaintiff went to Rochester General Hospital ("RGH"),

complaining that she had been experiencing painful, bloody bowel movements for two

years. (Tr. 286). A CAT scan showed thickening of the colon, suggestive of

inflammatory bowel disease. A physical examination was essentially normal, although

Plaintiff had blood in her stool. Plaintiff's liver function test was "very mildly" elevated.

(Tr. 287). Following a colonoscopy, Plaintiff was diagnosed with ulcerative colitis and given various medications. (Tr. 288-289).

In April 2004, Plaintiff visited Kevin Casey, M.D. ("Casey"), complaining of bloody diarrhea, and indicating that she had not been taking her medications, apparently because she "lost" them. (Tr. 298, 300). Casey's impression was that Plaintiff had Crohn's disease and was noncompliant with her medications. (Tr. 299).

On February 15, 2006, after almost a two year hiatus, Plaintiff returned to RGH and requested a prescription for "Wellbutrin," an antidepressant. (Tr. 340). The Office notes state: "[Plaintiff] here for a [follow-up] visit. Has not been seen for a long time, not taken any meds for Crohns for a long time." (Tr. 340). Plaintiff was not currently taking any medication, but reported that she was "doing well" with her bowel movements. (Tr. 340-341).

On March 23, 2007, Plaintiff went to RGH complaining of a sore throat, joint pain and depression/anxiety, and was seen by L. Landstrom, N.P. ("Landstrom") (Tr. 342-343). Landstrom's notes indicate that Plaintiff smelled of alcohol. (Tr. 342). Landstrom recommended that Plaintiff be evaluated for mental health issues and alcohol abuse. (Tr. 343).

On April 5, 2007, Plaintiff went to RGH, still complaining of a sore throat. (Tr. 344). According to Landstrom's notes, Plaintiff, whose breath smelled of alcohol, indicated that she wanted help for alcohol abuse and depression/anxiety. (Tr. 344). That same day, after meeting with Landstrom, Plaintiff met with a social worker, who also observed that Plaintiff smelled of alcohol, although Plaintiff denied having consumed any. (Tr. 346). Plaintiff admitted, though, to drinking too much in the past and to needing help. *Id*.

Plaintiff denied using illegal drugs, but the social worker doubted Plaintiff's veracity on that point. (Tr. 346).

On May 25, 2007, Plaintiff returned to RGH for another office visit with Landstrom, complaining of bruising and pain in her neck and back. (Tr. 348-349). At that time, Plaintiff claimed to be using alcohol twice per week. (Tr. 348). Landstrom's impression was bruising and pain secondary to trauma and alcohol abuse. (Tr. 349).

On June 4, 2007, the RGH social worker again met with Plaintiff at Landstrom's request. When the social worker asked Plaintiff why she had not followed up with mental health and alcohol treatment, Plaintiff stated that the agency, Rochester Rehab, had never called her. However, the social worker contacted Rohester Rehab, and learned that Rochester Rehab had attempted to contact Plaintiff many times, and had left messages at Plaintiff's apartment, but Plaintiff had never responded. (Tr. 350).

On July 3, 2007, Plaintiff returned to RGH and was seen by Sagar Nigwekar, M.D. ("Nigwekar"). Plaintiff was complaining of diarrhea and constipation and feeling depressed. (Tr. 352) Nigwekar's impression was alcohol dependence, Crohn's disease and anxiety/depression. (Tr. 353). Nigwekar counseled Plaintiff about her alcohol abuse and referred her to the social worker to get follow-up treatment.

On August 9, 2007, Plaintiff went to see Nigwekar complaining of bruised ribs and pain, which she claimed were the result of having fallen while on a boat. (Tr. 354). Nigwekar reported that Plaintiff's breath smelled of alcohol. (Tr. 354). Plaintiff admitted to consuming a pint of vodka every two days, and stated that she had not been able to "get help" at Rochester Rehab. *Id*. Plaintiff stated that her Crohn's disease was stable. *Id*. Nigwekar again counseled Plaintiff about the adverse effects of her alcohol abuse.

(Tr. 355).

On August 30, 2007, Plaintiff told Nigwekar that she had been consuming one pint of vodka per week, but had not had a drink in the last week. (Tr. 356). However, Nigwekar observed that Plaintiff smelled of alcohol. *Id*. Plaintiff told Nigwekar that she was "still doing some research" regarding alcohol treatment. *Id*. Plaintiff also complained of constipation. (Tr. 356). Nigwekar reported that Plaintiff's Crohn's disease was "stable." (Tr. 357).

On January 10, 2008, Plaintiff returned to Nigwekar, complaining of neck pain. (Tr. 358). Plaintiff stated that she was consuming one pint of vodka per day, to deal with the pain. *Id*. Plaintiff indicated that she was not taking her Crohn's disease medication and was not experiencing diarrhea. *Id*. Nigwekar again counseled Plaintiff about her alcohol abuse, but Plaintiff declined treatment. (Tr. 359).

On May 6, 2008, Plaintiff returned to see Nigwekar, again complaining of neck pain. (Tr. 360). Nigwekar observed that Plaintiff's breath smelled of alcohol, and Plaintiff indicated that she was consuming one pint of alcohol per day. *Id*. Nigwekar reported that Plaintiff's alcohol abuse was a "major problem!", though Plaintiff still declined treatment. (Tr. 361). Plaintiff denied having diarrhea. (Tr. 360).

On June 5, 2008, Plaintiff returned to Nigwekar, complaining of neck pain which, on a scale of severity from one to ten, was a three. (Tr. 362). Nigwekar reported that an MRI of Plaintiff's neck showed only "minimal" degenerative changes and no disc herniation. *Id*. Plaintiff stated that she was continuing to drink alcohol, but was "willing to quit." *Id*.

On August 25, 2008, Plaintiff went to see Nigwekar, smelling of alcohol and

complaining of pain in her calves. (Tr. 364). Plaintiff reportedly stated that she had lost her job at the Rochester Public Library due to "leg pains and alcohol use." *Id*. Plaintiff also had a lump and bruising on her rib cage, but could not recall how the injury had occurred. *Id*. Plaintiff stated that her neck pain was persisting, but that Tylenol was helping. *Id*. Plaintiff indicated that she was drinking one-half pint of alcohol per day. *Id*. Nigwekar's impression was that Plaintiff's leg pain was caused by "peripheral neuropathy" that was likely secondary to her alcohol abuse, and he prescribed Neurontin. (Tr. 365). Nigwekar counseled Plaintiff "extensively" about her alcohol abuse. *Id*. Nikwegar further reported that Plaintiff's heart rate was elevated, likely secondary to anxiety. *Id*.

On September 9, 2008, Plaintiff returned to Nigwekar, complaining of pain in both legs. (Tr. 366). Nikwegar observed that Plaintiff had not taken Neurontin, despite his earlier recommendation that she do so. *Id*. Nigwekar detected alcohol on Plaintiff's breath, and she admitted that she continued to drink, because it helped her pain. *Id*. Plaintiff also indicated that she was not interested in outpatient alcohol treatment. *Id*. Plaintiff had no complaints of diarrhea or rectal bleeding. (Tr. 366). Nigwekar's impression was that Plaintiff's leg pains were likely peripheral neuropathy, with possible cerebellum involvement, resulting from Plaintiff's alcohol abuse. (Tr. 367). Plaintiff's heart rate was normal. (*Id*.). Nigwekar reported that Plaintiff's Crohn's disease was "symptomatically stable on current [medication]." *Id*.

On September 30, 2008, Plaintiff returned to see Nigwekar, again with the odor of alcohol on her breath. (Tr. 368). Nigwekar reported that an MRI taken a few days earlier showed that Plaintiff had "cerebral and cerebellar volume loss." *Id*. Plaintiff was

complaining of pain in her feet and intermittent rectal bleeding, but no abdominal pain or diarrhea. *Id*. Nigwekar again counseled Plaintiff about the need for alcohol treatment, but Plaintiff declined treatment. (Tr. 369) ("Counseled at length again re: adverse effects of ETOH. Still pt. declines rehab. Says she understands all the risks including death.").

On January 8, 2009, Plaintiff returned to see Nigwekar, complaining of pain and bruising after she fell from a van while helping a friend move, three weeks earlier. (Tr. 370). Again, Nigwekar reported that Plaintiff's breath smelled of alcohol. *Id*. Nigwekar observed, "Alcohol use - I'm not sure how to convince Lynne to quit. She declines rehab despite repeated counselings." (Tr. 371). Nigwekar stated that Plaintiff had "abnormal" liver function test results secondary to alcohol use. *Id*.

On February 17, 2009, Plaintiff returned to seek Nigwekar, complaining of continued swelling in her sternum after her fall in December. (Tr. 372). Nigwekar reported that Plaintiff's breath smelled of alcohol, though Plaintiff claimed to be "cutting down" her alcohol consumption. *Id*.

On April 6, 2009, Plaintiff again saw Nigwekar for an office visit, at which time her breath smelled of alcohol. (Tr. 376). Plaintiff told Nigwekar that she was reducing her alcohol intake, but declined to be specific. *Id*. Plaintiff had a lump on her temple and bruising, which Nigwekar suspected was related to her falling down while intoxicated, though Plaintiff denied falling. (Tr. 377).

On May 1, 2009, Plaintiff sought treatment at the Strong Memorial Hospital Emergency department, for injuries that she reportedly sustained from being beaten up the night before, though she could not recall the details of the assault because she had been intoxicated. (Tr. 414-415). The attending medical provider reported that Plaintiff

was intoxicated, and Plaintiff indicated that she consumed one pint of alcohol every other day. (Tr. 414). Plaintiff was advised to take Tylenol or Advil for pain. (Tr. 417).

On June 19, 2009, Plaintiff returned to see Nigwekar, complaining of swelling in her right knee and a pinching pain in her right shoulder. (Tr. 378). Nigwekar reported that Plaintiff's breath smelled of alcohol. *Id*. Nigwekar indicated that Plaintiff had multiple bruises and areas of swelling on her body. *Id*. Nigwekar reported that another CT can of Plaintiff's brain showed cerebral volume loss, but was otherwise normal. *Id*. Nigwekar's impression was that the bruising and pain were the result of alcohol-related falls, though Plaintiff denied having fallen. (Tr. 379). Nigwekar reportedly advised Plaintiff to stop drinking, and told her "clearly" that she "will die" if she does not stop drinking. *Id*.

On July 2, 2009, neurologist Jebin Chacko, M.D. ("Chacko") performed a neurological examination of Plaintiff. (Tr.464 -466). Plaintiff reportedly denied having any problems walking generally, though she did indicate that she had "intermittent numbness" in her right leg "infrequently." (Tr. 464). Plaintiff stated that her main complaint was pain on the right side of her body, in the neck, arm and knee. *Id*. Plaintiff stated that her knee sometimes swelled, making it difficult for her to walk. *Id*. Chacko noted that Plaintiff had a history of chronic alcohol abuse and that she consumed "at least ½ pint of liquor a day, sometimes more and she has been drinking like this at least for the last year." (Tr. 464-465). Plaintiff claimed to be fatigued and to have anxiety, depression, occasional headaches and pain. (Tr. 465). Upon physical examination, Chacko found no tenderness in Plaintiff's cervical spine. (Tr. 465). Chacko conducted  a neurological examination, the results of which were normal. *Id*. Chacko observed that Plaintiff was

restless and constantly fidgeted "in both legs," but that she could stop that when asked to do so. *Id*. Chacko observed that Plaintiff's

> neurological exam at this time is essentially unremarkable. Neuro-imaging reveals mild cerebral and cerebellar atrophy, which may be related to her alcohol use. . . . I did tell the patient that with continued use of alcohol, she is definitely at risk for further brain atrophy, cognitive problems, withdrawal seizures, alcoholic cerebellar degeneration, and peripheral neuropathy, among other things. I have strongly recommended to the patient that she quit drinking. I do not have any further neurologic recommendations.

*Id*.

On July 22, 2009, neurologist Todd Holmquist, M.D. also conducted a neurological exam in response to Plaintiff's complaints of "stroke like symptoms." (Tr. 467-469). Plaintiff reportedly told Holmquist that she had been experiencing right-sided numbness for an indeterminate amount of time, as well as episodes of "facial contortions without further associated symptoms." (Tr. 467). Holmquist observed that Plaintiff admitted to consuming alcohol daily. (Tr. 468). A neurological exam was essentially normal, although Plaintiff "displayed manic speech" and "mildly reduced" muscle bulk. *Id*. Holmquist stated that his findings were "unremarkable save for findings of anxiousness, pressured speech, probable alcohol intoxication and sexual[ly] inappropriate comments, without clear focal neurologic findings." (Tr. 469).

On August 13, 2009, at the Commissioner's request Karl Eurenius, M.D. ("Eurenius") conducted a consultative internal medicine examination. (Tr. 257-260). At that time, Plaintiff complained of Crohn's disease, pain in her right shoulder and right knee, which she attributed to arthritis, and depression. Plaintiff stated that the Crohn's

disease caused her to have erratic bowel habits, with occasional diarrhea and occasional constipation. Plaintiff downplayed the extent of her alcohol consumption, stating that she consumed "perhaps three [alcoholic] drinks a week." (Tr. 257). Eurenius observed that Plaintiff constantly moved her legs, and occasionally her arms and neck, in an unusual manner. Eurenius conducted a physical examination, and his findings were essentially normal, although Plaintiff's bowel sounds were "hyperactive." (Tr. 259). Musculoskeletal and neurologic examinations were essentially normal, although Plaintiff complained of pain when "fully elevating" her right shoulder. (Tr. 259). Eurenius's diagnoses were Crohn's disease, possible arthritis in right shoulder and right knee, history of head injuries, "Athetoid-like spontaneous movements, particularly of the legs," and "depression, by history." (Tr. 260). Although Plaintiff claimed to be depressed, Eurenius did not observe her to be so, but instead, found her to be "pleasant" and in no acute distress. (Tr. 258). As far as functional limitations, Eurenius stated: "[S]he is mildly limited in lifting objects, particularly with her right hand, or handl[ing] objects above her head. She is also mildly limited in bending, climbing or descending stairs due to pain in her right knee." (Tr. 260).

On August 13, 2009, at the Commissioner's request Kavitha Finnity Ph.D. ("Finnity") conducted a consultative psychiatric evaluation. (Tr. 471-474). Finnity's report is notable for the fact that during the examination, Plaintiff again downplayed the severity of her alcohol abuse. On that point, Finnity stated: "The claimant reports that she uses alcohol about three times a week. She reports there have been periods where she has used more often." (Tr. 472). Plaintiff also reportedly told Finnity that she suffered from

arthritis, though the medical record does not support that claim. (Tr. 471).[1]  Plaintiff

complained of difficulty sleeping, increased appetite, depressed mood, crying, loss of

energy, feelings of worthlessness, lack of self-esteem and social withdrawal. *Id.*  Plaintiff

further claimed to have "two panic attacks a day," during which she would have "loss of

vision and increased perception where she feels everything is very loud to her." (Tr. 471-

472).  Plaintiff also claimed to have problems with her memory, concentration and

communication. (Tr. 472).  Plaintiff reported that she could do household chores, that

she had friends and socialized, and that she had a fair relationship with her family.

Upon examination, Finnity reported the following observations about Plaintiff: she

was not able to sit still; her thoughts were coherent and goal directed; her mood was

neutral; her affect was full and appropriate;  her attention, concentration and memory

were intact; her cognitive functioning was average; and her insight and judgment were

fair to good. (Tr. 472-473).  Although Plaintiff did not appear anxious or depressed,

Finnity apparently accepted her subjective complaints, since Finnity's diagnosis was

"depressive disorder, not otherwise specified," and "generalized anxiety disorder." (Tr.

473).  Finnity opined that Plaintiff could perform simple tasks and follow and understand

simple directions, learn new tasks and make appropriate decisions. *Id.*  Finnity stated,

though, that Plaintiff "may" have difficulty with concentration and attention and

---

[1]According to Plaintiff, Chacko diagnosed her with arthritis. *See*, Pl. Memo of Law [#8] at p. 5.
However, while Chacko did include arthritis under his "impression," he did not perform any testing to arrive
at such a conclusion.  Rather, it appears that he included that based on what Plaintiff told him. *See*, Tr.
464.  Moreover, while Eurenius similarly included "possible" arthritis in the right shoulder and right knee as
part of his report, he was apparently unaware that Nigwekar had previously obtained an x-ray of Plaintiff's
right knee that was negative. (Tr. 381).  Moreover, Nigwekar opined that Plaintiff's shoulder pain was due
to alcohol-related falls. (Tr. 378).  The Court is not aware of any diagnostic testing in the record to indicate
that Plaintiff has arthritis.

maintaining a regular schedule," and with relating to others and dealing with stress. *Id*.

Finnity did not explain why Plaintiff "might" have those limitations, since her psychological examination was essentially unremarkable. That is, as noted earlier, Finnity found that Plaintiff did not appear depressed, that her attention and concentration were intact, that her cognitive functioning was average, and that she did not express having any difficulty relating to people.[2]

On October 9, 2009, Plaintiff returned to see Nigwekar, complaining of pain in her right knee. (Tr. 476). Nigwekar again reported that Plaintiff's breath smelled of alcohol, *Id*., though Plaintiff stated that she had reduced her alcohol consumption. *Id*. at 478. Nigwekar noted that Plaintiff was "not taking any meds," and that the "neurologist had no other suggestions other than quitting ETOH [drinking]." *Id*. Nigwekar stated that Plaintiff's knee had some swelling but no tenderness. (Tr. 476). Plaintiff also claimed to be depressed, though she declined Nigwekar's offer to refer her for treatment. (Tr. 476-477). Nigwekar also noted that, at Plaintiff's request, he had completed a "physical residual functional capacity questionnaire" and placed a copy in the "chart." (Tr. 477). However, such assessment was not included in the other records submitted to the Commissioner by Plaintiff's attorney.

On January 21, 2010, Plaintiff returned to see Nigwekar, again with the odor of alcohol on her breath. (Tr. 478). Plaintiff was complaining of "body aches and pains," but was unable to quantify or describe the pain. *Id*. Nigekar reported that Plaintiff had mild lumbar tenderness. *Id*. Nigwekar observed "multiple trigger points" and prescribed

---

[2]It is also curious that Finnity recommended that Plaintiff seek treatment for "cognitive deficits," even though she stated that Plaintiff's cognitive functioning was "estimated to be average." (Tr. 473, 474).

Flexeril. (Tr. 478-479). Nigwekar reported that Plaintiff again declined a referral for alcohol treatment. (Tr. 479).

On February 25, 2010, Plaintiff was involuntarily hospitalized after she was found on the street, heavily intoxicated, crying and yelling for help. (Tr. 523).

On September 6, 2010, Plaintiff was hospitalized for two weeks for treatment of septic shock, resulting from a kidney infection. (Tr. 504, 509). Upon admission to the hospital, Plaintiff's urine tested positive for "cocaine, THC and opiates," (Tr. 513), though she had consistently told her doctors that she was not using illegal drugs. The discharge summary indicated, *inter alia*, that Plaintiff should have an outpatient cardiac stress test (Tr. 510), apparently out of concern that Plaintif had suffered a coronary event during her hospitalization. (Tr. 514, 538). The discharge summary further observed that Plaintiff's Crohn's disease had been "well controlled without flare since 2005." (Tr. 513).

On September 27, 2010, Plaintiff returned to RGH and was seen by Nurse Practitioner Landstrom. Landstrom's notes discuss the circumstances of Plaintiff's recent hospitalization for her kidney infection, and indicate that she warned Plaintiff that she must not drink alcohol. (Tr. 535). It appears that Landstrom prescribed Plaintiff something for agitation and leg movements. (Tr. 534). Landstrom noted that Plaintiff had an upcoming appointment for mental health evaluation. *Id*. Plaintiff indicated that she had not been drinking. *Id*. Plaintiff indicated that she had felt a pain in her right shoulder the previous week, and upon examination there was some tenderness in the shoulder. *Id*.

On October 4, 2010, Plaintiff returned to RGH and was seen by Landstom. (Tr. 538). Plaintiff indicated that she was doing well, but that she "ha[d] had a little beer." *Id*.

Plaintiff also indicated, though, that she had started attending  rehab group program. *Id*. Landstrom noted that Plaintiff was not as restless as she had been at the previous visit. *Id*.

On October 14, 2010, Plaintiff was again seen by Landstrom. (Tr. 539). Landstrom noted that Plaintiff had recently completed an echocardiogram, which was "normal except [for] mild mitral valve regurgitation." *Id*.  Plaintiff complained of insomnia and Landstrom prescribed Ambien. *Id*.

On October 18, 2010, Plaintiff obtained a mental health evaluation, performed by Amy Rhoads, a "mental health intern." (Tr. 486, 497).  Plaintiff reportedly sought the evaluation because she was "anxious and sad because of many issues." (Tr. 487). Plaintiff claimed to feel "hyperactive," said she felt uncomfortable going outside, and said she felt sad because of her medical problems. (Tr. 488).  Plaintiff claimed to sleep ten hours per night. *Id*.  Plaintiff stated that she likes to paint, decorate and watch television. *Id*.  Plaintiff indicated that she had previously used alcohol, tobacco, marijuana and cocaine. (Tr. 489).  With regard to alcohol, Plaintiff apparently stated that she consumed "3 beers or 3 drinks," "4-6 times per week," resulting in "mild intoxication." *Id*.  Plaintiff claimed to have arthritis, stomach/bowel problems, kidney disease, liver disease, alcohol abuse, Crohn's disease and Colitis. (Tr. 492).  Rhoads reported that Plaintiff seemed agitated and restless, hyperactive, with rapid slurred speech. (Tr. 494).  Rhoads stated that Plaintiff seemed alert and oriented with good insight and judgment, but appeared anxious and distractible, with poor concentration. *Id*.  Rhoads recorded that:

> Pt. reports she has current feelings of sadness, but not worthlessness
> mainly due to medical conditions and wanting to work and 'contribute' to

> society and not being able to. Pt. said her friend died 2 years ago of heart
> failure and she found him – this loss has been difficult for her to deal with
> emotionally. [Diagnosed] with Arthritis this past year. [The record contains
> no such diagnosis] Pt. presents as future oriented and looks forward to
> getting her medical issues under control and researching ways she can go
> back to work.

(Tr. 496-496). Rhoads' diagnoses were "depressive disorder not otherwise specified" and "anxiety disorder not otherwise specified." (Tr. 486). Rhoads recommended that Plaintiff come for outpatient counseling "1-3 times per months." (Tr. 496). Rhoads' evaluation lasted sixty minutes, and her written report was apparently later reviewed and confirmed by Katherine Cariola, LMHC, a "Licensed Mental Health Counselor." (Tr. 486). Such a counselor is not an acceptable medical source under 20 CFR § 404.1513(a), but could be considered as an "other source" under 20 CFR § 404.1513(d).

On October 15, 2010, Landstrom completed a residual functional capacity assessment for employment, on a form prepared by the Monroe County Department of Human Services. (Tr. 498-501, Hearing Exhibit 17F). Landstrom expressed the opinion that Plaintiff was unable to work for a period of four months, and could only engage in treatment or rehab during that period. (Tr. 499). Landstom stated that her assessment was "mental health, alcohol rehab, neurology, GI [gastrointestinal], needs future cardiac stress testing, possible cardiology." (Tr. 499). Landstom listed Plaintiff's chief complaints as being "insomnia[3], depression/anxiety, alcohol abuse, possible movement disorder [and] recent hospitalization for . . . septic shock." (Tr. 499).

Landstrom indicated that Plaintiff's prognoses for her various ailments was either

---

[3]It seems odd that Landstrom would list insomnia as one of Plaintiff's complaints, since Plaintiff reportedly told Rhoads, at around this same time, that she slept ten hours per night. (*See*, Tr. 488).

good or fair, except the prognosis for her alcohol abuse and depression/anxiety, which was "poor" because she declined treatment. (Tr. 499). Landstrom indicated that upon a physical examination, the only unusual findings were Plaintiff's constant fidgeting, as well as tenderness in her right shoulder and decreased range of movement in that shoulder. (Tr. 500-501). As for specific functional limitations, Landstrom stated that Plaintiff had an unlimited ability to walk and/or stand, but could only sit for "1-2 hours" during an 8-hour workday, because she "can't sit still." (Tr. 501). Landstom stated that Plaintiff could lift and/or carry for 1-2 hours during a workday. Id.

In addition to the aforementioned office-visit notes, the record includes reports of various diagnostic testing. Specifically, over a period of years, in response to Plaintiff's complaints of joint pain and traumatic injuries, such as falls, Nigwekar ordered various diagnostic testing, such as x-rays and CT scans. (Tr. 303-310, 319-321, 381-403, 406, 423-426). However, those tests were essentially normal, except to the extent that they showed mild degenerative joint disease (Tr. 394) and "generalized cerebral volume loss, more than expected for age" (TR. 384), the latter of which Nigwekar attributed to alcohol abuse.

To summarize, within the foregoing medical evidence, the following sources provided opinions concerning Plaintiff's exertional- and non-exertional limitations:

L. Landstrom, N.P., treating Nurse Practitioner: Plaintiff has an unlimited ability to walk and/or stand, but can only sit for 1-2 hours during an 8-hour workday; because she "can't sit still" (Tr. 501); Plaintiff can lift and/or carry for 1-2 hours during an 8-hour workday. Id. Plaintiff should not work for four months, to allow her to pursue alcohol rehabilitation and/or mental health treatment. (Tr. 499).

Jebin Chacko, M.D., treating neurologist:  Plaintiff constantly fidgets with both legs, but can stop when asked to do so. (Tr. 465).

Karl Eurenius, M.D., non-treating consultative examining internist:  Plaintiff "is mildly limited in lifting objects, particularly with her right hand, or handl[ing] objects above her head.  She is also mildly limited in bending, climbing or descending stairs due to pain in her right knee." (Tr. 260).

Kavitha Finnity, Ph.D., non-treating consultative psychologist:  Plaintiff can perform simple tasks and follow and understand simple directions, learn new tasks and make appropriate decisions; Plaintiff  "may" have difficulty with concentration and attention and maintaining a regular schedule," and with relating to others and dealing with stress. (Tr. 473).

Otherwise, the medical evidence can be summarized as indicating that Plaintiff has the following medical problems: Uncontrolled alcohol abuse, Crohn's disease/colitis that is well-controlled with medication, mild degenerative changes in the cervical spine without nerve involvement, that is controlled by over-the-counter pain relievers, mild depression, mild anxiety and general body aches and pains that her primary care doctor attributes to peripheral neuropathy secondary to alcohol abuse.  Physical and neurological testing is essentially normal, except as already indicated.

THE HEARING

On November 24, 2010, Administrative Law Judge Gerardo Perez ("the ALJ") conducted a hearing, at which Plaintiff, two medical experts, and a vocational expert testified.  Plaintiff testified, *inter alia*, that she stopped working in August 2008 (Tr. 66), and that she stopped working primarily because of her Crohn's disease/colitis. (Tr. 67-68).  As already discussed, however, the medical records indicate that in August, 2008, Plaintiff's Crohn's disease was essentially asymptomatic.  Moreover, at the time she lost

her job, Plaintiff reportedly told Nigwekar that she stopped working due to "leg pains and alcohol use." (Tr. 364). *Id*. Plaintiff also told the ALJ that she was continuing to experience severe problems with her Crohn's/colitis, even on the date of the hearing (*see, e.g.*, Tr. 69-70, 74), even though, two months earlier, when she was hospitalized for her kidney infection, she reportedly told hospital staff that her Crohn's disease had been "well controlled without flare since 2005." (Tr. 513). Plaintiff also told the ALJ that she had arthritis in her legs, ankles, knees and hands (Tr. 71-72), even though the record contains no such diagnosis. Plaintiff stated that her legs move constantly, and that she was going to see a neurologist about the problem, even though the record indicates that she had already been examined by two neurologists, neither of whom found neurological problems, and one of whom indicated that Plaintiff was able to stop the leg movements at will. (Tr. 70). Plaintiff did not mention those earlier visits to neurologists, and instead, indicated that she had an upcoming appointment with a neurologist.[4] Plaintiff also indicated that she was depressed, and to illustrate that point, she indicated that she cried easily, such as when watching "Charmin commericals," or when she misplaced things at home. (Tr. 72-73). Plaintiff further stated that she was "really having problems sleeping at night" (Tr. 73), even though, one month earlier, she reportedly told Rhoads that she slept ten hours per night. (Tr. 488). When the ALJ asked Plaintiff if she had problems with concentration, Plaintiff said yes, and indicated that she "tr[ied] to multitask too much," and sometimes "forg[o]t where [she] put things." (Tr. 74). When the ALJ asked Plaintiff about her alcohol use, Plaintiff initially stated that she was not "continuing to

---

[4] *See*, Tr. 71 ("Q. All right. And has your neurologist told you what's going on with that? A. No, I haven't seen him yet.")

drink," but then added that she did "have a beer here and there." (Tr. 75). Plaintiff indicated that he boyfriend often helped her with chores, but that she was able to do them herself, and that she could lift and carry twenty pounds. (Tr. 77). Plaintiff further stated that, although she fidgets when she sits, she can sit "for a long time" when watching television, and "do[esn't] ever want to get up usually." (Tr. 78). Plaintiff stated that she can walk "five blocks" to the store and back, though she will feel tired afterward. (Tr. 78). Plaintiff further indicated that she had "joined a[n alcoholism] program" one day prior to the hearing. (Tr. 75). Moreover, Plaintiff stated that her alcohol abuse was not a factor in her being unreliable at her last job (Tr. 76), even though she had previously told Nigwekar the opposite. (Tr. 364).

The ALJ also took testimony from medical expert German Malaret, M.D. ("Malaret") (Tr. 81-83).[5] Malaret opined that while Plaintiff did appear to have some inflammatory bowel problems, it did not appear to be Crohn's disease. (Tr. 82). Malaret indicated that Plaintiff's primary problems appeared to be her constant body movements and her alcohol abuse. (Tr. 82). Malaret noted that Plaintiff's body movements did not appear to be caused by a neurological problem, and that she could stop them. *Id*.

The ALJ also took testimony from psychiatric expert Luis Canepa, M.D. ("Canepa"). (Tr. 84-88). Canepa opined that Plaintiff had "minimized" her alcohol use when being examined by Finnity, and that Plaintiff's alcohol abuse was "very much related" to her "anxiety and depressive features." (Tr. 85). Canepa indicated that Plaintiff's alcoholism met the requirements for listings 12.04 and 12.09. (Tr. 85-86).

---

[5]There appears to be a transcription error, in that the word "alcoholism" appears to have been twice mis-transcribed as "oncologist." (See, Tr. 81).

Canepa also agreed that Plaintiff may have difficulty concentrating. (Tr. 86). Canepa stated, though, that Plaintiff would not have any listed psychiatric impairment if she stopped abusing alcohol. (Tr. 87-88).

The ALJ also took testimony from vocational expert Marieva Puig ("the VE"). The ALJ asked the VE whether someone who, due to concentration problems, was limited to "simple, repetitive work," who was limited to "only occasional interaction with the general public," who could occasionally lift and carry twenty pounds occasionally and ten pounds frequently, and who could not work around ladders, ropes or scaffolds, could perform Plaintiff's past relevant work, and the answer was "no." (Tr. 90). However, the VE indicated that such a person could perform other jobs, such as "sorter," DOT 753.587-010 and "labeler," DOT 920.687-126. (Tr. 91). The ALJ then asked the VE to consider that the aforementioned hypothetical person also need to take a five-minute bathroom break every hour, and the VE indicated that such a person could still perform the jobs that she had already identified. (Tr. 92). In response to Plaintiff's attorney's question, the VE indicated, though, that if such person had to consistently take entirely unscheduled bathroom breaks, she would not be able to perform those jobs, or any jobs. (Tr. 93). The VE also stated, in response to the attorney's question, that if the hypothetical person was "off task" 20% of the time, due to concentration problems, that such person would not be able to work. (Tr. 93). Finally, in response to the attorney's question, the VE indicated that if the hypothetical person consistently had to miss three days per month from work, she would not be able to perform any job. (Tr. 94).

The record indicates that at the start of the hearing, the medical exhibits before the ALJ included Exhibits 1F through 15F. (Tr. 65). At the close of the testimony, the

ALJ agreed to leave the record open for a week to allow Plaintiff's attorney to submit any additional medical evidence (Tr. 94), and the attorney apparently submitted additional exhibits 16F and 17F, including Landstrom's RFC assessment, which are referenced in the ALJ's decision. (Tr. 27). On January 21, 2011, the ALJ issued his Decision, denying Plaintiff's applications for benefits. (Tr. 24-35). Subsequently, on January 30, 2011 and February 13, 2011, respectively, Plaintiff submitted Exhibits 19F and 18F to the Appeals Council, parts of which were duplicative of earlier exhibits. (Tr. 4, 503, 526, ). However, the Appeals Council ruled that the additional information did not provide a basis for changing the ALJ's ruling. (Tr. 1-2).

THE ALJ'S DECISION

The ALJ concluded that Plaintiff is under a disability, but that her substance abuse disorder – chronic alcohol abuse – is a contributing factor material to the determination of disability. The ALJ further determined that, apart from Plaintiff's alcohol abuse, her remaining limitations would not be disabling. Based on that finding, the ALJ concluded that Plaintiff was not disabled, pursuant to 42 U.S.C. § 423(d)(2)(C).

In that regard, the ALJ began by finding that Plaintiff had not engaged in substantial gainful activity since January 1, 2007,[6] and that she had the following severe impairments: "alcohol dependence with secondary anxiety and depressive features and inflammatory bowel disease [(ulcerative colitis in the sigmoid intestine)] ." (Tr. 27). The ALJ also found that Plaintiff's substance abuse disorder met the criteria for listings 12.04 and 12.09. The ALJ concluded that if Plaintiff stopped abusing alcohol, she would still

_____

[6] Plaintiff's work at the Rochester Public Library, which ended in 2008, was part-time, and the ALJ found that it was not substantial gainful employment. (Tr. 27).

have a severe impairment or combination of impairments, but they would not meet or equal a listed impairment. The ALJ concluded that if Plaintiff stopped drinking, she would have the residual functional capacity to perform light work, although less than the full range of light work, in that she would have the following restrictions: The work must consist of simple repetitive jobs requiring only occasional interaction with the public, not involving ladders, ropes or scaffolds, and with the ability to take a five-minute bathroom break every hour. Based on this RFC determination, the ALJ found that Plaintiff could not perform her past relevant work, but that she could perform other jobs, including the job of "Sorter," DOT 753.587-010, and "Marker," DOT 920.687-126. The ALJ therefore concluded that Plaintiff was not disabled.

The ALJ emphasized that his determinations were consistent with the opinions of Plaintiff's primary treating doctor, Dr. Nigwekar:

> The record evidences a claimant with chronic alcohol dependence that has resulted in anxiety and depressive manifestations as well as physical impairments. . . . The record evidences psychiatric symptoms that are dependent on the claimant's drinking and physical impairments that have resulted because of her drinking. . . . Dr. Nigwekar opined that the claimant's various injuries, abnormal liver function tests and loss of cerebella volume were all due to alcohol dependence.

(Tr. 27). The ALJ did not take issue with any aspect of Nigwekar's notes or findings.

As part of the decision, and prior to making his credibility determination, the ALJ alluded to Plaintiff's credibility at various times. For example, the ALJ observed that Plaintiff "downplayed the severity of her addiction enough so that Dr. Finnity did not include dependence in [her] diagnosis." (Tr. 28). The ALJ further noted that when Plaintiff was speaking to Rhoads, she did not admit "the severity of her chronic alcohol

26

use." (Tr. 32). Additionally, the ALJ noted that Plaintiff claimed to have arthritis, even though there was no basis to that assertion. *See*, Tr. 30 ("Dr. Casey had ruled out arthritis and the radiographic tests did not present any evidence of arthritis."). The ALJ also noted that Plaintiff's subjective complaints were not supported by the medical record. *See, e.g.*, Tr. 28 ("Concerning the claimant['s] physical impairments, the record presents multiple objective tests that generally do not substantiate her complaints of pain. . . . The record evidences that the claimant has inflammatory bowel disease and loss of cerebella volume that cause her limitations. Otherwise, the objective evidence contradicts the claimant's multiple complaints.").

## DISCUSSION

As mentioned above, the standard of review that the Court must apply is "substantial evidence," and in the Court's view there is ample evidence to support the ALJ's ultimate determination. However,

> [w]here an error of law has been made that might have affected the disposition of the case, this court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ. Failure to apply the correct legal standards is grounds for reversal.

*Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (*quoting Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir.1984) (internal quotation marks and citations omitted)). Accordingly, the Court must consider whether the ALJ applied the correct legal principles in reaching his decision. The Court is mindful, though, that

> [a]n ALJ does not have to state on the record every reason justifying a decision. Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted. An ALJ's failure

to cite specific evidence does not indicate that such evidence was not considered.

*Brault v. Social Sec. Admin., Com'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citations omitted).

<u>The ALJ's Duty to Develop the Record/The Effect of the lack of an RFC statement from a treating physician</u>

Plaintiff maintains that the ALJ committed legal error by failing to develop the record. Specifically, Plaintiff contends that the office notes of Dr. Nigwekar, Plaintiff's primary care physician between 2007 and 2010, do not include a statement concerning Plaintiff's "function-by-function limitations," and that the ALJ therefore had a duty to contact Dr. Nigwekar and obtain such a statement. Defendant disagrees, and contends that the ALJ was not required to obtain an RFC statement from Nigwekar, since the record was sufficient to allow the ALJ to conclude that, but for Plaintiff's alcohol abuse, she would not be disabled. *See*, Def. Memo of Law at 24 ("Here, substantial evidence existed to show that, absent alcohol abuse, plaintiff was not disabled. Thus, the ALJ was not obligated to obtain additional evidence.").

It is well-settled that disability hearings are non-adversarial, and that an ALJ has a duty to develop the record in certain instances. However,

> [a]lthough an ALJ has an affirmative duty to develop the administrative record even when a claimant is represented by counsel, *see Perez v. Chater*, 77 F.3d 41, 47 (2d Cir.1996), "where there are no obvious gaps in the administrative record, and where the ALJ already possesses a complete medical history, the ALJ is under no obligation to seek additional information in advance of rejecting a benefits claim," *Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir.1999) (internal quotation marks omitted); *see also* 20 C.F.R. § 416.912(d) (stating that before ALJ will determine that claimant is "not disabled, [ALJ] will develop [claimant's] complete medical history").

*Lowry v. Astrue*, 474 Fed.Appx. 801, 804, 2012 WL 1142308 at *2 (2d Cir. Apr. 6, 2012).

At the outset, in considering this point, the Court observes that is unusual for the record not to contain an RFC assessment from the primary treating physician. That is particularly true here, since Plaintiff was represented by an attorney at the administrative hearing, and since Nigwekar's office notes indicate that he actually completed such a report. (Tr. 477). However, the question is, must the record contain such a statement in order to be considered "complete?" Certainly, there are numerous district court decisions in this circuit that answer the question in the affirmative. *See, e.g., Beller v. Astrue*, No. 12 CV 5112(VB), 2013 WL 2452168 at *15, 18 (S.D.N.Y. Jun. 5, 2013) (Holding, and collecting cases standing for the proposition that, the ALJ's duty to develop the record dovetails with the treating physician rule, and requires the ALJ to obtain an RFC statement from the treating physician); *see also, Martello v. Astrue*, No. 12–CV–215S, 2013 WL 1337311 at *3 (W.D.N.Y. Mar. 29, 2013) (Skretny, C.J.) ("Where a treating physician has not assessed a claimant's RFC, the ALJ's duty to develop the record requires that he *sua sponte* request the treating physician's assessment of the claimant's functional capacity." (citations omitted).[7]

---

[7]This Court is aware that other courts have held that an ALJ does not err by failing to obtain an RFC assessment from a treating physician, provided that the record contains RFC assessments from other sources. For example, in *Austin ex rel. R.M.B. v. Commissioner of Social Sec.*, No. 6:12–cv–465 (GLS), 2013 WL 1855833 at *1-2 (N.D.N.Y. May 1, 2013), the court stated:

[T]he record contains treatment notes from both Drs. Kore and Johri. Moreover, the record contains medical source statements with respect to R.M.B.'s physical and mental functional abilities from consultative examiners as well as the opinions of non-examining psychological and pediatrics experts. Austin correctly points out that the ALJ has a "heightened duty" to develop the record when a claimant proceeds *pro se*. However, the ALJ fulfilled that duty by conducting an extensive hearing, during which he permitted Austin to discuss any issues that she felt were important, questioned Austin as to whether there was any additional evidence to collect, and, thereafter, obtained the opinion of an impartial medical expert. Ultimately, as the ALJ had before him substantial evidence that enabled him to render a decision with respect to R.M.B.'s limitations,

However, quite recently, a panel of the Second Circuit Court of Appeals rejected the idea that an ALJ's failure in his duty to request an RFC assessment from a treating physician necessarily or automatically requires a remand. Specifically, in *Tankisi v. Commissioner of Social Security*, No. 12–1398–cv, 2013 WL 1296489 (2d Cir. Apr. 2, 2013), a case in which the appellant was represented by the same law firm representing Plaintiff in this action,[8] the panel stated:

> Tankisi first asserts that the ALJ committed error in assessing her RFC by failing to seek an opinion from her treating physicians as to whether Tankisi could meet the physical demands of work. Social Security Administration rules provide that "[m]edical reports should include ... [a] statement about what you [i.e., the Claimant] can still do despite your impairment(s) ... Although we will request a medical source statement about what you can still do despite your impairment(s), the lack of the medical source statement will not make the report incomplete." 20 C.F.R. §§ 404.1513(b)(6), 416.913(b)(6). The record does not indicate that the ALJ made the requests addressed by this provision.
>
> Citing case law from district courts in this circuit, Tankisi suggests that this absence is fatal. *See, e.g., Funk v. Astrue*, No. 1:10–cv–602 (MAD), 2012 WL 501017, at *4–5 (N.D.N.Y. Feb. 15, 2012); *Peed v. Sullivan*, 778 F.Supp. 1241, 1245–46 (E.D.N.Y.1991). Indeed, the plain text of the regulation does not appear to be conditional or hortatory: it states that the Commissioner " will request a medical source statement" containing an opinion regarding the claimant's residual capacity. 20 C.F.R. §§ 404 .1513(b)(6), 416.913(b)(6). The regulation thus seems to impose on the ALJ a duty to solicit such medical opinions.
>
> However, the text indicates that "[m]edical reports should include ... [a]

the court is satisfied that further development of the record was unnecessary.

(citations omitted).

[8]Plaintiff's reply brief, though submitted a month after the *Tankisi* decision, does not mention the Second Circuit's ruling.

statement about what you can still do despite your impairment," not that they must include such statements. *Id*. (emphasis added). It also indicates that "the lack of the medical source statement will not make the report incomplete." *Id* . Other regulations also state that a case record " may contain medical opinions." See, e.g., 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) (emphasis added). These provisions indicate that the ALJ's conclusions would not be defective if he requested opinions from medical sources and the medical sources refused. <u>Taken more broadly, they suggest remand is not always required when an ALJ fails in his duty to request opinions, particularly where, as here, the record contains sufficient evidence from which an ALJ can assess the petitioner's residual functional capacity.</u> *See Moser v. Barnhart*, 89 F. App'x 347, 348 (3d Cir.2004); *Scherschel v. Barnhart*, 72 F. App'x 628, 630 (9th Cir.2003); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir.1995).

The medical record in this case is quite extensive. Indeed, although it does not contain formal opinions on Tankisi's RFC from her treating physicians, it does include an assessment of Tankisi's limitations from a treating physician, Dr. Gerwig.[9] Given the specific facts of this case, including a voluminous medical record assembled by the claimant's counsel that was adequate to permit an informed finding by the ALJ, we hold that it would be inappropriate to remand solely on the ground that the ALJ failed to request medical opinions in assessing residual functional capacity. *Cf. Lowry v. Astrue*, 474 F. App'x 801, 804 (2d Cir.2012) (summary order); *Rosa v. Callahan*, 168 F.3d 72, 79 n. 5 (2d Cir.1999).

*Id*. at *4 (emphasis added, footnote omitted); *see also, Brogan-Dawley v. Astrue*, 484 Fed.Appx. 632, 634, 2012 WL 2096630 at *1 (2d Cir. 2012) ("Nor did the ALJ need to develop the record further and recontact Dr. Sullivan. The ALJ was required to do so only if the records received were "inadequate ... to determine whether [Brogan–Dawley was] disabled," which was not the case here. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir.1996);

---

[9]This Court has examined the submissions that were before the district court in *Tankisi*, 10-CV-6412 DGL, and it appears that "the assessment of Tankisi's limitations" given by Dr. Gerwig consisted of a statement that Ms. Tankisi should not perform work that involved repetitive bending, twisting, lifting, or kneeling. *See*, 10-CV-6412, docket no. [#14], Plaintiff's memo of law, and docket no. [#12-1], Defendant's memo of law.

see 20 C.F.R. § 404.1512(e) (2007).").

Consequently, to the extent Plaintiff maintains that reversal is automatically required in this action merely because the ALJ did not request or obtain an RFC assessment from Nigwekar, the Court disagrees. Rather, the issue is whether the record was adequate to permit the ALJ to determine whether or not Plaintiff was disabled. The Court finds that it was.

On this point, the record is extensive, as discussed above. Additionally, as already noted, the record includes an RFC assessment from a treating "other source," Nurse Practitioner Landstrom, who is a member of the same RGH outpatient clinic as Nigwekar. The ALJ referenced Landstrom's report, Exhibit 17F, and the Court presumes that he considered it, even though he did not expressly say so. (Tr. 27). Landstrom's RFC assessment is generally consistent with the ALJ's RFC determination, though it is slightly more restrictive than the ALJ's ruling with regard to lifting/carrying. In this regard, the ALJ found that Plaintiff could perform less than the full range of light work. Light work

> involves lifting no more than 20 pounds at a time with *frequent lifting or carrying of objects weighing up to 10 pounds.* Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time.

20 CFR § 404.1567(b) (emphasis added). The Commissioner defines "frequent" to mean "occurring from one-third to two-thirds of the time." SSR 83-10, 1983 WL 31251 at

*5-6.

Landstrom's RFC assessment indicates that Plaintiff can walk and/or stand all day, can sit for 1-2 hours during an 8-hour workday, and can lift and/or carry for 1-2 hours during an 8-hour workday. (Tr. 501). To be able to lift and/or carry ten pounds frequently, Plaintiff would need to be able to so do for at least 2.6 hours during an 8-hour workday, which is slightly more than what Landstrom has indicated. However, Landstrom provided no basis for that opinion, which is contrary to the rest of the record. More importantly, Plaintiff admitted that she can lift up to twenty pounds, and the medical record shows no basis for any restriction on Plaintiff's ability to lift or perform any other physical activity, except for possible neuropathy caused by Plaintiff's alcohol abuse and/or pain from injuries sustained during alcohol-related falls.

Plaintiff speculates that, "[h]ad the ALJ recontacted Dr. Nigwekar, Dr. Nigwekar's opinion could have limited Plaintiff to sedentary or less than sedentary work which is in contrast to the RFC of light work." (Pl. Memo of Law [#8] at p. 14). Considering Nigwekar's office notes, though, it is not reasonable to expect that he would conclude that Plaintiff was disabled, unless he based such opinion on her alcohol abuse, since his copious reports primarily discuss the negative effects of Plaintiff's drinking, including the secondary effect of pain in her legs, and do not give any indication that she has any other medical problem that would prevent her from working.

For all of these reasons, the Court finds that the ALJ's failure to develop the record, by obtaining an RFC assessment from Nigwekar, does not require remand.

### The ALJ's RFC Determination

Plaintiff contends that the ALJ also made the following errors in connection with

33

his RFC determination: 1) he failed to explain the weight that he gave to Eurenius's opinion; 2) to the extent that the ALJ relief on Eurenius's opinion, that was error, since the opinion is expressed in vague terms, such as "mildly limited," and did not state exactly how much Plaintiff could lift; 3) he substituted his opinion for Eurenius's, since Eurenius did not render an opinion regarding Plaintiff's ability to sit, stand or walk, but the ALJ interpreted Eurenius's opinion as meaning that Plaintiff was not significantly limited as to those activities; and 5) he failed to explain the weight that he gave to Finnity's opinion, he misstated her opinion and he failed to reconcile her opinion with the RFC determination.

With regard to the ALJ's discussion of Eurenius's opinion, the Court does not agree that he substituted his opinion for that of the doctor's when he interpreted Eurenius's report as not significantly limiting Plaintiff's ability to sit, stand or walk. The Court also disagrees with Plaintiff's assertion that Eurenius's report was "incomplete" because it did not specifically address Plaintiff's ability to sit, stand or walk. Pl. Memo of Law [#8] at p. 19. In light of the dearth of any findings to impose such limitations, it is not surprising that Eurenius did not discuss those activities. Rather, he discussed the areas in which he felt that Plaintiff had limitations.

Plaintiff further contends that the ALJ erred by relying on Eurenius's report since the doctor used terms that were too vague, such as "'moderate' an 'mild,' without additional information." Pl. Memo of Law [#8] at p. 18. It is true that recently, the Second Circuit indicated that a doctor's statement that a claimant could "lift objects of a *mild* degree of weight on an *intermittent* basis" was "remarkably vague" and left its meaning to the "ALJ's sheer speculation." *Selian v. Astrue*, 708 F.3d 409, 421 (2d Cir. 2013)

(emphasis added). In that case, the circuit panel held that the ALJ should have contacted the doctor to seek "clarification," pursuant to 20 CFR § 404.1520b(c)(1). *Id.*, 708 F.3d at 421. Here, Eurenius indicated that Plaintiff is "mildly" limited as to certain activities, such as lifting (Tr. 260), but did not quantify Plaintiff's exertional capabilities. However, this alleged error does not require remand, since the report of Plaintiff's own nurse practitioner, Landstrom, and the rest of the record, including Plaintiff's own hearing testimony, is consistent with the ALJ's RFC determination, except as already noted.

With regard to Finnity, Plaintiff alleges that the ALJ failed to explain the weight that he gave to her opinion, misstated her opinion and failed to reconcile her opinion with the RFC determination. The Court again disagrees. In that regard, while the ALJ did not specifically state the degree of weight that he was giving Finnity's opinion, he compared it to Canepa's opinion, and indicated that he was giving more weight to Canepa's opinion, which he viewed as being "even more beneficial to the claimant's application." (Tr. 33). Furthermore, to the extent that Plaintiff believes that the ALJ misstated Finnity's opinion, the Court reads the ALJ's decision differently. On this point, Plaintiff argues that when the ALJ wrote that "Finnity's opinion was stated including alcohol abuse," he was wrong because Finnity did not discuss alcohol abuse. However, the Court believes that the ALJ meant to convey that even though Plaintiff hid her alcohol abuse from Finnity, Finnity's opinion nevertheless describes Plaintiff's abilities when she was actively abusing alcohol. *See*, Tr. 33.

### The ALJ's Credibility Determination

Plaintiff maintains that the ALJ's credibility determination, which found Plaintiff's complaints of pain were not credible to the extent that they were inconsistent with the

RFC determination, was erroneous.  Specifically, Plaintiff contends that the ALJ did not properly consider the factors listed under 20 C.F.R. § § 404.1529(c)(1) & 416.929(c)(1).  For example, with regard to Plaintiff's activities of daily living, she contends that the ALJ failed to consider that she needs her boyfriend to help her do the laundry, that she claims to be forgetful and have difficulty concentrating,[10]  and that she has very irregular and sometimes incapacitating patterns of  bowel movements.  Plaintiff further argues that it is generally improper for an ALJ to reject a claimant's credibility to the extent that it is inconsistent with an RFC determination.

With regard to the sufficiency of credibility determinations, the Commissioner has stated that

> [i]t is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7P, 1996 WL 374186 at *2 (SSA, Jul. 2, 1996).  Moreover, it is not sufficient for an ALJ to merely state that he finds the claimant incredible to the extent that her

---

[10]The Court does not agree that Plaintiff stated that she "needed" her boyfriend's help to do the laundry.  Plaintiff actually indicated that her boyfriend usually did the laundry, but that she was capable of doing it herself. (Tr. 76-77).  She also implied that it might hurt her back to lift laundry weighing more than twenty pounds, (Tr. 77), but that limitation is factored into the ALJ's RFC finding.  Similarly, the ALJ factored in Plaintiff's alleged inability to concentrate by limiting her to simple work.

complaints are inconsistent with his RFC determination.[11]   As mentioned above, though,
"[f]ailure to expressly consider every factor set forth in the regulations is not grounds for
remand where the reasons for the ALJ's determination of credibility are sufficiently
specific to conclude that he considered the entire evidentiary record in arriving at his
determination." *Wischoff v. Astrue*, No. 08–CV–6367 MAT, 2010 WL 1543849 at *7
(W.D.N.Y. Apr. 16, 2010) (citation and internal quotation marks omitted).[12]

As already discussed, the instant record is rife with instances in which Plaintiff
either made statements that are contradicted by other uncontroverted evidence, or
withheld or minimized the extent of her alcohol abuse from treating and examining
sources.  The ALJ alluded to some of those instances. (*See, e.g.*, Tr. 32) ("[C]laimant
omitted reporting the severity of her chronic alcohol use."); *(see also, id.)* (Noting that the
consultative psychologist was at a disadvantage because she had to rely on "claimant's
self-reported history.") .  The ALJ also noted that Plaintiff's subjective complaints were

---

[11] *See, Cruz v. Colvin*, No. 12 Civ. 7346(PAC)(AJP), 2013 WL 3333040 at *16 (S.D.N.Y. Jul. 2, 2013) ("ALJ Hornblass accurately explained this two-step process, but failed to properly apply it to Cruz. First, ALJ Hornblass' credibility assessment was lacking in specificity.  While ALJ Hornblass summarized the evidence in the record, he failed to point out which portion caused him to doubt Cruz's credibility. Second, ALJ Hornblass essentially reversed the standard by finding that Cruz was not credible because Cruz's complaints were not compatible with ALJ Hornblass' own RFC determination, as opposed to the objective record evidence.  Neither the Social Security regulations nor this Circuit's caselaw support the idea that an ALJ may discredit a claimant's subjective complaints on the basis of the ALJ's own finding of the claimant's RFC.") (citations and footnote omitted; collecting cases).

[12] *See also, Stallings v. Colvin*, 2013 WL 3713315 at *6 (W.D.N.Y. Jul. 12, 2013) ("In making this credibility determination, the ALJ must consider seven factors: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medications taken; (5) other treatment received; (6) other measures taken to relieve symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vii); *see also Meadors*, 370 F. App'x at 184 n. 1. The ALJ, however, is not required to discuss all seven factors in his decision as long as the decision includes precise reasoning, is supported by evidence in the case record, and clearly indicates the weight the ALJ gave to the claimant's statements and the reasons for that weight.") (*citing Snyder v. Barnhart*, 323 F.Supp.2d 542, 546–47 & n. 5 (S.D.N.Y. 2004)).

not supported by the various medical testing. (*See*, Tr. 28) ("[T]he record presents multiple objective tests that generally do not substantiate her complaints of pain. . . . [T]he objective evidence contradicts the claimant's multiple comnplaints."). The ALJ made these observations as part of his overall RFC determination. Moreover, the ALJ discussed the appropriate standard for evaluating credibility. (Tr. 32).

Consequently, although the ALJ summed up his credibility determination by indicating that he found Plaintiff credible only to the extent that her subjective complaints were consistent with his RFC determination, the Court finds that remand is not necessary. It appears that the ALJ applied the necessary factors and made a finding as to Plaintiff's credibility that was probably more generous than this Court would have made if it were conducting a *de novo* review. On this point, the Court notes that the ALJ gave Plaintiff the benefit of the doubt on several points. For example, with regard to Plaintiff's complaints of bowel symptoms, the ALJ included hourly bathroom breaks in his RFC determination, even though the medical record indicates that Plaintiff's symptoms were well-controlled.[13]

### The ALJ's Determination at Step Five of the Sequential Analysis

Lastly, Plaintiff maintains that the step five determination is not supported by substantial evidence, because the ALJ's hypothetical question to the VE was incomplete. Plaintiff contends that the hypothetical question was incomplete because it was based on the ALJ's erroneous RFC determination, as alleged above. Plaintiff also contends that the hypothetical failed to incorporate Eurenius's opinion that Plaintiff would be limited

---

[13]On this point, the Court observes that Plaintiff's testimony at the hearing concerning her bathroom problems seems wildly inconsistent with her reported statements to medical providers during the years prior to the hearing.

with regard to bending and using stairs, and Finnity's opinion that Plaintiff would have difficulty with attention, concentration, maintaining a regular schedule and stress. The Court disagrees, and finds that the hypothetical questions to the VE accurately reflected the ALJ's RFC finding, which is supported by substantial evidence. Although Eurenius and Finnity opined that Plaintiff "might" have difficulty with the activities mentioned above, the ALJ was not required to accept those opinions. That is particularly so since, for example, Finnity's equivocal suggestion that Plaintiff "might" have difficulty with attention and concentration was contradicted by her actual findings upon examining Plaintiff, which showed that Plaintiff had no problems with attention, concentration or cognitive functioning. (Tr. 473). In any event, the ALJ included Plaintiff's alleged difficulties with concentration and attention in the hypothetical, by stating that the hypothetical claimant was limited to "simple, repetitive work." (Tr. 90).

CONCLUSION

For the reasons set forth above, Plaintiff's motion [#7] is denied, Defendant's motion [#13] is granted and the Commissioner's determination is affirmed. The Clerk of the Court is directed to enter judgment for Defendant and close this action.

So Ordered.

Dated: Rochester, New York
       August 20, 2013
                                        ENTER:


                                         /s/ Charles J. Siragusa____
                                        CHARLES J. SIRAGUSA
                                        United States District Judge